**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,        ) | CR 08-954-PHX-JAT |
| Plaintiff,        ) | **ORDER** |
| vs.        ) | |
| Marlon Rubio,        ) | |
| Defendant.        ) | |

Pending before the Court is Defendant Rubio's Motion to Suppress Statements and Evidence (Doc. #101). Defendant advances four theories why the statements and evidence should be suppressed: 1) the initial entry into the residence was illegal; 2) the seizure of Defendant violated the Fourth Amendment; 3) the seizure of Defendant was an arrest without probable cause; and 4) all evidence obtained after either of the three preceding events is fruit of the poisonous tree.

**I.     Factual Background**

At the hearing on April 21, 2009, agent Andreas Milona testified to the following facts. On July 19, 2008, ICE received information about a hostage and ransom situation in Phoenix, Arizona. Specifically, the ICE agents received information from Michelle Ponce that her brother was being held hostage following his being illegally smuggled into the country, and that his captors had demanded ransom money. The ICE agents then began monitoring Ms. Ponce's calls with the captors. The agents learned from these calls that the

1 captors had weapons. The captors ultimately set a deadline of July 20, 2008 for Ms. Ponce
2 to pay. Ms. Ponce did not have the money to pay, and did not pay the randsom. The captors
3 had warned Ms. Ponce that if she did not pay by the deadline they "could not guarantee" the
4 safety of her brother.

5 From these phone calls, the ICE agents obtained a warrant to use a tracking device to
6 determine the location of the cell phone the captors were using. Using this device, the agents
7 determined that the cell phone was being used at a house, the address of which was 4551 N.
8 51st Avenue, Phoenix, Arizona. On July 21, 2008, at 6:00 a.m., the agents arrived at this
9 location and contacted the Phoenix police department. While waiting for Phoenix officers
10 to arrive,[1] the ICE agents made several phone calls to the captors and through these calls
11 determined that Ms. Ponce's brother was still alive. Once the Phoenix officers arrived, the
12 ICE agents and the Phoenix officers entered the house at approximately 8:30 a.m.

13 During a sweep of the house, the agents saw twenty-seven undocumented aliens and
14 three guns. After securing the people and the house, the agents obtained a warrant at 2:00
15 p.m. After obtaining a warrant, the agents conducted a search of the house.

16 Among the people found in the house, the agents determined three of them were the
17 alleged captors, i.e., the smugglers/hostage-takers. Specifically, the agents identified
18 Defendants Rubio, Flores-Canales, and Espinoza-Calix as the smugglers/hostage-takers. The
19 agents identified Defendant Rubio specifically because he was cleaner and better kempt than
20 the people the agents identified hostages. Additionally, Defendant Rubio had on sneakers
21 that the hostages were not wearing. Finally, Agent Milona testified that he believed
22 Defendant Rubio was the person he saw moving a car earlier in the day before the agents
23 entered the residence. Thus, Defendant Rubio appeared to be free to leave. Based on all of
24 these factors, the agents determined Defendant Rubio was one of the smugglers/hostage-
25 takers. However, Defendant Rubio maintained in his interview with the agents that he was

---

[1] The ICE agents determined that it was necessary to wait for the Phoenix officers
because the Phoenix officers were specially trained for this type of entry, specifically where
human hostages and weapons were involved.

- 2 -

one of the illegal aliens who had been smuggled into the country who was being ransomed back to his family.

**II.     Discussion**

**A.     Initial Entry Into Residence**

Defendant Rubio seeks to suppress "the evidence" from the "illegal" search. Doc. #101 at 6. Defendant Rubio does not specify what exact evidence he is trying to suppress. However, he is arguing that the entry into the home was illegal because the agents did not have a warrant nor did they have probable cause to enter the house. *Id*. at 5.

The government responds and argues that, preliminarily, Defendant Rubio lacks the right to challenge the entry into the home because he did not have a reasonable expectation of privacy within the home. Doc. #119 at 5. Alternatively, the government argues that the warrantless entry into the home was permissible under the exigency exception to the warrant requirement. *Id.* at 6. As a further alternative (if the Court disagrees with both of the preceding arguments), the government argues that the warrant obtained at 2:00 p.m. cured the prior lack of a warrant because no evidence was "seized" during the first entry, the evidence was only noted by the agents. *Id.* at 7.

Generally, searches and seizures of a residence without a warrant are presumptively unreasonable. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). However, a person has the right to challenge the lack of a warrant only if that person experiences a personal violation of a legitimate expectation of privacy. *Minnesota v. Carter*, 525 U.S. 83, 91 (1998). Even if the person has a legitimate expectation of privacy, there are exceptions to the warrant requirement. For example, a warrant is not required when the government can show exigent circumstances that justified entry into the residence without waiting for a warrant. *Stuart*, 547 U.S. at 403. Finally, an unjustified warrantless entry can be cured if the officers later obtain a warrant justified by a source other than what was located in the residence. *See Hudson v. Michigan*, 547 U.S. 586, 600 (2006).

### 1. Legitimate Expectation of Privacy

In this case, the government argues Defendant Rubio does not have standing to challenge the entry into the home because he disavowed any claim or expectation of privacy when he asserted to the agents that he was an alien who had been smuggled into the country who was being held in the residence against his will. As discussed above, for Defendant to challenge a warrantless search, he must have an expectation of privacy in the place searched and his expectation much be reasonable under concepts or real or personal property law recognized by society. *Carter*, 525 U.S. at 87-88. Additionally, Defendant bears the burden of proving he had a legitimate expectation of privacy. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980); *United States v. Silva*, 247 F.3d 1051, 1055 (9th Cir. 2001).

Given Defendant's statements regarding how he came to be in the residence, the Court finds that Defendant did not have a legitimate expectation of privacy in the residence and therefore, he cannot challenge the warrantless entry. *See Abel v. United States*, 362 U.S. 217, 241 (1960); *United States v. Gonzales*, 979 F.2d 711, 714 (9th Cir. 1992) (disclaimed ownership results in abandonment of expectation of privacy, regardless of the government's theory of ownership). In other words, Defendant Rubio had no legitimate expectation of privacy in a home in which he claimed he was being held hostage against his will.

Further, even under the government's theory of the case, that Defendant Rubio was a smuggler/hostage-taker, Defendant has offered no factual scenario which would cause him to have a legitimate expectation of privacy in the residence. Specifically, Defendant has not claimed that he owned, rented, or was an invited guest in the home; nor has he articulated any other theory of an expectation of privacy.

Thus, under both Defendant's version of why he was in the residence and the government's version of why Defendant was in the residence, Defendant has not shown any real or personal property theory that would give rise to him having a legitimate expectation of privacy in the residence. Accordingly, Defendant can not challenge the warrantless entry into the residence and his motion to suppress on this basis will be denied.

### 2. Exigency

Alternatively, the government argues that even if Defendant had an expectation of privacy, the warrantless entry into the residence was lawful under the exigency exception to the warrant requirement. As discussed above, in the usual case, a warrantless entry into a private residence is presumptively unreasonable. *Stuart*, 547 U.S. at 403. "The presumption of unreasonableness can be overcome, however, when the police confront an exigent circumstance ...." *United States v. Johnson*, 256 F.3d 895, 905 (9th Cir. 2001) (*en banc*) (internal citation omitted).

"Exigent circumstances are those in which a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay a search [or arrest] until a warrant could be obtained." *United States v. Gooch*, 6 F.3d 673, 679 (9th Cir. 1993) (internal citation and quotation marks omitted; brackets in original). "Exigent circumstances are present when a reasonable person [would] believe that entry . . . was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. Alaimalo*, 313 F.3d 1188, 1192-93 (9th Cir. 2002) (citation and quotation omitted; alterations in original).

"Even when exigent circumstances exist, police officers must have probable cause to support a warrantless entry into a home. Probable cause requires only a fair probability or substantial chance of criminal activity, and we determine the existence of probable cause by looking at 'the totality of the circumstances known to the officers at the time.'" *Alaimalo*, 313 F.3d at 1193 (internal citation omitted; quoting *United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001)). Thus, if the government wishes to rely on exigent circumstances to justify the entry and initial sweep of the house, it "must satisfy two requirements: first, the government must prove that the officer had probable cause to search the house; and second, the government must prove that exigent circumstances justified the warrantless intrusion." *Johnson*, 256 F.3d at 905.

1      In this case, the government claims that the agents had probable cause to enter the
2  residence.  This probable cause was based on the fact that Ms. Ponce had repeated
3  conversations with the captors who said that they had her brother hostage and that they could
4  not guarantee his safety if she did not pay them.  Further, Ms. Ponce's brother had told her
5  that his captor's had weapons. Finally, the deadline for Ms. Ponce to pay had expired. Thus,
6  after using the tracking to identify the house in question and calling the captors to obtain
7  proof that Ms. Ponce's brother was still alive, the agents (with the Phoenix officers) entered
8  the residence.  Considering the totality of the circumstances, and given the repeated phone
9  calls and threats, the Court finds that there was a fair probability or substantial chance of
10 criminal activity in the residence. Accordingly, the Court finds that probable cause to enter
11 was present.
12     With respect to exigent circumstances, the Court finds that there was a substantial risk
13 of harm to a person, specifically Ms. Ponce's brother.  The deadline for Ms. Ponce to pay had
14 just expired and Ms. Ponce had been advised that if she did not pay by that deadline the
15 captors could not guarantee her brother's safety.  Further, the agents knew the captors were
16 armed based on Ms. Ponce's brother's statements in his phone conversation.  Considering
17 all of these facts, the Court finds that the exigent circumstances exception to the warrant
18 requirement justified the warrantless entry into the residence in this case.
19     At the hearing, defense counsel argued that, with the benefit of hindsight, the agents
20 had enough time to obtain a warrant before entering the house.  The time line is that the
21 agents, at some point between 4:00 a.m and 6:00 a.m., identified the residence in question.
22 They arrived at the residence at 6:00 a.m.  Thereafter they observed the house to ensure they
23 were at the correct residence.  They also contacted the smugglers to obtain confirmation the
24 Ms. Ponce's brother was still alive.  During this time, the Phoenix officers were called,
25 arrived, and prepared to enter the house.  Law enforcement entered the house at 8:30 a.m.
26     Based on this time line, defense counsel argues that between when the agents first
27 knew this was the house (between 4:00 a.m. and 6:00 a.m.) and when they entered (8:30
28 a.m.) they could have obtained a warrant. However, the law is clear that the Court does not

1  consider an exigency with the benefit of hindsight. *See Fisher v. City of San Jose*, 558 F.3d
2  1069, 1082 (9th Cir. 2009) (*en banc*) (the Court should focus on "the nexus between the
3  challenged entr[y] and the original exigency that prompted the warrantless action — not on
4  whether, in hindsight, officers had sufficient time to obtain a warrant in the interim before
5  the subsequent warrantless entr[y] occurred.")  In *Fisher*, the Court found no constitutional
6  violation when a warrantless entry occurred almost 12 hours after the officers arrived on the
7  scene. *Id.* at 1072-73. The Court of Appeals went on to note that the exigency of the armed
8  gunman did not dissipate by the passage of time and therefore, at the time of entry, the
9  exigency still existed. *Id.* at 1083-84.
10  In this case, the Court finds that the exigency existed at the time of entry, particularly
11  after confirmation that Ms. Ponce's brother was still alive. As a result, the Court finds that
12  the exigency exception to the warrant requirement applies in this case. Thus, even assuming
13  arguendo that Defendant Rubio had a legitimate expectation of privacy in the residence, the
14  Court will deny the motion to suppress because the entry into the residence did not violate
15  Defendant's rights.

### 3. Cure of Taint by Later Obtained Warrant

17  As a final alternative, the government argues that all evidence obtained from the home
18  is admissible based on the later obtained warrant. Defendant does not counter this argument
19  in his reply. As the government notes, if law enforcement illegally enters a premises without
20  a warrant, but later obtains a warrant based on information that was not obtained from the
21  illegal entry, the Court will not suppress the evidence found in the premises. *See Hudson*,
22  547 U.S. at 600 ("We refused to exclude the resulting evidence." ... noting, "None of the
23  information on which the warrant was secured was derived from or related in any way to the
24  initial entry into petitioners' apartment... . It was therefore beyond dispute that the
25  information possessed by the agents before they entered the apartment constituted an
26  independent source for the discovery and seizure of the evidence now challenged." (internal
27  quotations and citations omitted)).
28

1  In this case, when the agents entered the home and conducted the "protective sweep"
2  they secured the people they found, but they did not take any evidence or conduct a search.
3  Instead they secured the residence, observing some weapons in the residence, and then
4  obtained a warrant. *See* Doc. #116-2 for copy of warrant. The warrant received in evidence
5  at the hearing had one paragraph which was additional evidence obtained from the protective
6  sweep of the house. Specifically, that paragraph noted that the officers had observed
7  weapons and undocumented aliens in the house. Because the warrant was obtained primarily
8  on the same affidavit used to obtain the tracking warrant, this case is similar to *Hudson* in
9  that even if the initial entry was illegal, the evidence obtained need not be suppressed.
10  Accordingly, the motion to suppress could also be denied for this additional alternative
11  reason. However, since the Court has found that both Defendant did not have a reasonable
12  expectation of privacy in the home and that the warrantless entry into the home was
13  permissible under the exigency exception to the warrant requirement, the Court need not rely
14  on this basis as its reason for denying the motion to suppress.

### B. Seizure of Defendant

16  Defendant claims that his "seizure" and subsequent arrest following the agents' entry
17  into the home was improper because the probable cause to arrest him could not be obtained
18  by virtue of the illegal entry into the home. Defendant cites nothing to support this argument.
19  Regardless, however, the Court has concluded that the entry into the residence was not
20  illegal. Thus, Defendant's argument fails because it is premised on the theory that the entry
21  was illegal.

### C. Probable Cause to Arrest

23  Next, Defendant argues that when he was "seized" by agents following their entry into
24  the residence, he was under arrest. Doc. #101 at 7. The government does not dispute that
25  Defendant Rubio was not free to leave following the agents detaining him. Defendant goes
26  on to argue that this "arrest" was improper because it was not supported by probable cause.
27  *See generally Michigan v. Summers*, 452 U.S. 692, 700 (1981) (holding that probable cause

- 8 -

is required for a warrantless arrest). Defendant then concludes that "Thus, the arrest of defendant Rubio violated his protections under his Fourth Amendment." Doc. #101 at 8.

Preliminarily, the Court is unclear what Defendant Rubio seeks to suppress if he prevails on this argument. Nonetheless, the government responds and argues that the agents had probable cause to arrest. Probable cause to arrest,

> exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested... Alternatively, this court has defined probable cause as follows: when under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime.

*United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (internal citations and quotations omitted).

In this case, the agents had significant evidence leading up to their entry into the home that there were illegal aliens in the home and that those aliens had been taken hostage by their smugglers. As recounted above, based on his general appearance, including his hair, his shoes, and his cleanliness, and his ability to leave the residence to move the car, the agents believed Defendant Rubio to be one of the smugglers/hostage-takers. Thus, the agents had probable cause to arrest him on this basis. Moreover, as the government argues, alternatively the agents had a reasonable belief that everyone in the residence who was not a smuggler was illegally in the United States. Thus, regardless of whether each occupant was classified as a smuggler or an illegal-alien-hostage, the agents had probable cause to believe that each of them was committing a crime. Accordingly, the agents had probable cause to arrest Defendant Rubio.

### D. Fruit of the Poisonous Tree

Because the Court has concluded that the agents actions in this case did not violate any of Defendant's constitutional rights, Defendant's fruit of the poisonous tree argument is moot.

/ / /

/ / /

### III.  Conclusion

Based on the foregoing,

**IT IS ORDERED** that Defendant's motion to suppress statements and evidence (Doc. #101) is denied.

DATED this 27th day of April, 2009.

_____
James A. Teilborg
United States District Judge